IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DAVE HODGE, BEN LANNING, | ) | |
| | ) | |
| Plaintiffs, | ) | **CASE NO. CV 06-263-MHW** |
| | ) | |
| -vs- | ) | |
| | ) | **MEMORANDUM DECISION** |
| LEAR SIEGLER SERVICES, INC., a | ) | **AND ORDER** |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Currently pending before the Court for its consideration is Defendant's Motion for Partial Summary Judgment (Docket No. 47), filed January 18, 2008.  At the class certification phase, the Court directed the parties to file a summary judgment motion to further define the appropriate groups within the class.  Specifically, the Court requested summary judgment briefing concerning whether compensable "work" included commute time or driving time.  *See* Mem. Decision and Order, Docket No. 43.  The Court heard oral argument on April 16, 2008,[1] and asked the parties at the conclusion of the hearing to file post-hearing briefs concerning the applicability of the Portal-to-Portal Act, 29 U.S.C. § 254, to the facts present in this case.  Both parties have taken the opportunity to submit briefing on the subject, although the Defendant

---

[1]  At oral argument, the parties limited themselves to argument about passenger commuters, not drivers of the busses and vans full of fellow employees, and it appeared that defense counsel agreed at the end of the hearing that drivers of the vans and busses may be an appropriate subgroup of the class.

MEMORANDUM DECISION AND ORDER - 1

submitted an additional brief (Docket No. 62) that Plaintiffs have moved to strike.  Docket No. 63.  Both motions are now ripe for review.  The Court finds that Defendant's Motion for Partial Summary Judgment and Plaintiffs' Motion to Strike should be granted for the reasons discussed in this opinion.

## I.
## BACKGROUND AND FACTS

On July 7, 2006, Plaintiff Dave Hodge filed a Complaint against his former employer, Defendant Lear Siegler Services, Inc. ("LSI"), for breach of his employment contract.  He later amended his complaint to add Mr. Ben Lanning as a plaintiff and sought class certification. Docket No. 20.  On December 7, 2007, the Court issued its memorandum decision and order certifying a class of hourly workers employed by LSI and sent to work in Iraq at one of LSI's work sites at any time between March 1, 2004 and the present.

LSI, under a subcontract agreement, provided mechanics and other support personnel to facilitate the United States military mission in Iraq.  LSI civilian employees were housed at various military bases and paid hourly for the work they performed.  The employment agreement was the same for all hourly workers with regard to reimbursement policies, and in straightforward terms stated that payment for overtime would be made at a base hourly wage for "all hours worked over 40 hours per week."  But, Plaintiffs claim that LSI breached their employment contract by failing to pay them and other employees stationed in Iraq for "all hours worked."  They assert that class members should have been compensated for driving company vans and busses full of other LSI employees from their housing units to the work site, commuting time as passengers on those same vans and busses, and for off the clock and overtime work in addition to their standard work week.

MEMORANDUM DECISION AND ORDER - 2

Upon review of the parties' submissions in support of LSI's motion for summary judgment, it appears that the following facts are not in dispute.  Both named Plaintiffs and members of the class signed identical employment contracts with LSI.  Def.'s Stmt. of Facts, Ex. B, Docket No. 47-4.  The Employment Agreement specified the terms and conditions of employment for LSI's civilian employees deployed in Iraq.  As part of their agreement, LSI employees were provided transportation and housing on United States military bases.  *See* Def.'s Stmt. of Facts, Ex. B at 7, Docket No. 47-4; Pls.' Stmt. of Facts at ¶ 2, Docket No. 52.  Plaintiffs did not have a choice of where their housing units were in relation to their work sites, and had to travel in company supplied vans and buses up to thirty minutes each way to their work sites.  Pls.' Stmt. of Mat. Facts at ¶ 2, Docket No. 52.  The route could be treacherous and employees were required to pass through military check points.  *Id.*

The Employment Agreement referred to compliance with policies and procedures in several places.  In the beginning of the Agreement under "General Terms and Conditions," the Employment Agreement specified that the employee was "responsible for compliance with LSI's Code of Business Conduct, and Policies and Procedures."  Def.'s Stmt. of Facts, Ex. B at 3, Docket No. 47-4.  Elsewhere in the "Standards of Conduct" section, the agreement stated that "[y]ou must observe the standards of conduct and other requirements of LSI's Code of Business Conduct and LSI's Policies and Procedures in effect at your Date of Hire and as updated periodically . . . . You are also required to comply with all Corporate Policies including all Project or Work Location Policies."  Def.'s Stmt. of Facts, Ex. B at 11, Docket No. 47-4.  Misuse or abuse of LSI policies, including falsification of time cards, subjected an employee to disciplinary action.  Def.'s Stmt. of Facts, Ex. B at 11-12, Docket No. 47-4.  Employees

MEMORANDUM DECISION AND ORDER - 3

"agree[d] to become familiar with the rules, regulations, laws, policies, customs and traditions at the Assignment Location and acknowledge[d] their applicability to [their] employment."  Def.'s Stmt. of Facts, Ex. B at 14, Docket No. 47-4.

Within the Employment Agreement, in the paragraph entitled "Compensation," LSI agreed to pay its employees a "Base Hourly Wage" at a stated wage rate, and further stated that "[a]ll hours worked over 40 hours per week will be paid at the straight base hourly wage rate." Def.'s Stmt. of Facts, Ex. B at 5, Docket No. 47-4.  The Employment Agreement does not define "work."  Employees initialed each page of the Employment Agreement and signed an acknowledgment that they had read it and consented to all of its conditions.  Def.'s Stmt. of Facts, Ex. B at 17, Docket No. 47-4.  In September 2004 and April 2005, Hodge and Lanning respectively signed agreements with LSI that contained all of the above provisions.

Separate written employment policies existed that explained LSI's timekeeping procedures.  Def.'s Stmt. of Facts, Ex. F, Docket No. 47-4.  On May 10, 2005, and June 21, 2005, respectively, Lanning and Hodge signed an acknowledgment that they had received a copy of LSI's Timekeeping Procedures.  Stmt. of Facts, Ex. H, Docket No. 47-5.  Part of that acknowledgment requested that they "[r]ecord ALL hours worked," and to "[r]ead and follow LSI Timekeeping Procedures."  *Id.*  LSI's Timekeeping Procedures were provided to employees and reviewed in training with all new LSI hires.  Def.'s Stmt. of Facts, Ex. A at ¶ 11, Docket No. 47-3.  The policy stated that employee time began when the employee arrived at work and ended upon departure.  Def.'s Stmt. of Facts, Ex. G, Docket No. 47-5.  Additional policy documents applicable during Plaintiffs' employment also stated that employee time began when the

MEMORANDUM DECISION AND ORDER - 4

employee arrived at the work location and ended upon departure.  Def.'s Stmt. of Facts, Ex. F,

Docket No. 47-4.

## II.
## DISCUSSION

**A.    Plaintiffs' Motion to Strike**

As an initial matter, the Court has before it Plaintiffs' Motion to Strike the supplemental

memorandum filed by Defendant.  After the hearing on LSI's motion for partial summary

judgment, the Court requested that the parties each submit one simultaneous brief discussing the

applicability of the Portal-to-Portal Act, 29 U.S.C. § 254, on or before May 2, 2008.  Docket No.

59.  The parties both did so.  Docket Nos. 60, 61.  However, LSI submitted a second brief

responding to the arguments Plaintiffs raised in their post-hearing brief.  Docket No. 62.

Plaintiffs seek to strike the supplemental response brief based upon the Court's order, while LSI

argues it is simply responding to the novel arguments Plaintiffs raised.

The Court is not inclined to entertain LSI's supplemental brief without allowing Plaintiffs

an opportunity to respond, prolonging the briefing schedule even further.  Moreover, the Court

specifically asked the parties to submit one brief each, and neither party requested additional

briefing.  That Plaintiffs may have raised a novel argument is beside the point considering the

Court asked for simultaneous briefs.  The Court is therefore granting Plaintiffs' motion to strike,

and will not consider the response brief LSI filed.

**B.    Legal Standards Governing Motions for Summary Judgment.**

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56 provides in

pertinent part that judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings."  *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Id.* at 250.  "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability."  *Id.* at 254.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of

MEMORANDUM DECISION AND ORDER - 6

material fact." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth

Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to
> establish a genuine issue of fact with respect to any element for
> which it bears the burden of proof; (2) must show that there is an
> issue that may reasonably be resolved in favor of either party; and
> (3) must come forward with more persuasive evidence than would
> otherwise be necessary when the factual context makes the non-
> moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371,

374 (9th Cir. 1989).

## C.    Arguments of the Parties.

The parties' main argument is whether the Employment Agreement incorporates by

reference LSI's timekeeping policies.  LSI contends that under Texas law,[2] the principles of

contract interpretation allow for incorporation of other writings by reference so long as the

signed contract plainly refers to another writing.  Mem. at 5, Docket No. 41-1 (citing *Raymond*

*James & Assocs., Inc. v. Bowman*, 196 S.W.3d 311, 318 (Tex. App. 2006).  LSI argues that the

Employment Agreement unambiguously referred to LSI's Timekeeping Procedures, which in

turn defined work as beginning at the time an employee arrived at his or her work station and

ending upon leaving the work station.  Plaintiffs contend that the Employment Agreement did

not plainly reference LSI's Timekeeping Procedures, and rely upon *Trico Marine Servs. v.*

*Stewart & Stevenson Tech. Servs.*, 73 S.W.3d 545, 549 (Tex. App. 2002).

---

[2]  Both parties agree that the Employment Agreement requires application of Texas law.  *See*  Employment
Agreement, Stmt. of Facts, Ex. D, Docket No. 47-4.

MEMORANDUM DECISION AND ORDER - 7

Additionally, the Court asked the parties to address the application of the Portal-to-Portal Act, 29 U.S.C. §§ 251 *et. seq.*, ("PPA") to this dispute. Plaintiffs argue that the parties' contract incorporated federal law by agreement, since Texas law necessarily incorporates federal law. They cite *Yung v. Integrated Transp. Network Group, Inc.*, 2001 U.S. Dist. LEXIS 24715 (S.D.N.Y. Sept. 4, 2001), in support of their argument. LSI contends that the PPA must be read in context with the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et. seq.* LSI argues that because the FLSA expressly exempts foreign employment from the minimum wage and overtime pay provisions, and the PPA limits the application of the minimum wage and overtime pay provisions, then the FLSA exclusion also prohibits extraterritorial application of the PPA. Even if the FLSA does not apply, Plaintiffs argue that cases decided under the FLSA are analogous and that commute time under those statutory provisions has been considered as "work."

**D.      Whether LSI's Policies Are Incorporated by Reference.**

The primary goal in construing a contract is to give effect to the parties' intent as expressed in their agreement. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). Whether a contract is ambiguous is a question of law for the Court to decide by looking at the contract as a whole in light of the circumstances existing at the time it was executed. *Gulf Ins. Co.*, 22 S.W.3d at 423; *Reilly v. Rangers Mgt.*, 727 S.W.2d 527, 529 (Tex. 1987). A contract is not ambiguous if its language can be given a definite and certain meaning. *Gulf Ins. Co.*, 22 S.W.3d at 423. On the other hand, if the contract is subject to two or more reasonable interpretations, the contract is ambiguous and a factual issue is present concerning the parties' intent. *Columbia Gas Transmission Co. v. New ULM Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.

MEMORANDUM DECISION AND ORDER - 8

1996).  However, simply because the parties advance conflicting interpretations of a contract

does not mean an ambiguity exists.  *Columbia Gas Transmission Co.*, 940 S.W.2d at 589.  When

at all possible, Courts should avoid giving an "unreasonable, inequitable, and oppressive"

construction to contracts, and need not embrace strained rules of interpretation.  *Reilly*, 727

S.W.2d at 530.  For an ambiguity to exist, both interpretations must be reasonable.  *Columbia*

*Gas Transmission Co.*, 940 S.W.2d at 589.

"Under generally accepted principles of contract interpretation, all writings that pertain to

the same transaction will be considered together, even if they were executed at different times

and do not expressly refer to one another."  *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d

96, 102 (Tex. 1999).  An integration clause is not required to incorporate one document into

another.  *Gray & Co. Realtors, Inc. v. Atlantic Housing Foundation, Inc.*, 228 S.W.3d 431, 436

(Tex. App. 2007).  "Instead, all that is required is that the incorporated document be referenced

by name."  *Gray & Co. Realtors, Inc.*, 228 S.W.3d at 436.  The specific language used is not

important so long as the contract signed by the party plainly refers to another writing.  *In re*

*Raymond James & Assocs., Inc.*, 196 S.W.3d 311, 316 (Tex. 2006).

In this case, the Employment Agreement specifically references employer "policies"

three separate times.  The Employment Agreement unambiguously refers to compliance with

LSI's "Policies and Procedures" on page one of the Agreement.  Again on page eleven, the

Agreement refers to "Policies and Procedures" in effect upon the date of hire and as updated

periodically, specifically mentioning compliance with all "Work Location Policies."  Stmt. of

Facts, Ex. B, Docket No. 47-3.  On page fourteen, the Agreement requires the employee to

become familiar with the rules, regulations, and policies at the assigned location and states that

these rules and policies are conditions of employment.  In addition, Plaintiffs signed a separate written acknowledgment that they understood LSI's Timekeeping Procedures, and agreed to read and follow them.  Stmt. of Facts, Ex. H, Docket No. 47-5.  These timekeeping policies and procedures were set forth in LSI's training manual, which explained that time to be recorded on a time sheet began when the employee arrived at work and ended upon departure.  Stmt. of Facts, Ex. G, Docket No. 47-5.  Mr. Wagstaff stated in his affidavit that LSI's timekeeping policy was reviewed in training with all new hires.  Stmt. of Facts, Ex. A ¶ 11, Docket No. 47-3.

While a close call, the facts of this case are more like those in *Raymond James* than in *Trico Marine Servs.*, and compel the conclusion that LSI's timekeeping policies were expressly incorporated by reference into the Employment Agreement.  In *Raymond James*, the defendants signed a "New Account Form" containing a statement above the signature line that they had received, read, and understood "all the terms and conditions set forth in the Client Agreement." Defendants unsuccessfully argued that they should not be bound by the terms of the Client Agreement, as they had never been given a copy.  The court held that even if the defendants had never seen the Client Agreement or signed a copy of it, they were on explicit notice that such a document existed and were therefore bound by its terms, because the Account Form explicitly referenced  a separate document.  *In re Raymond James & Assocs., Inc.*, 196 S.W.3d at 319.

In contrast, the contract in *Trico Marine Servs.* did not clearly reference another document.  In that case there was a Proposal and a separate, unattached document entitled "General Terms & Conditions of Sale."  Within the Proposal, the phrase "General Terms & Conditions of Sale" appeared in the table of contents and in a heading at the bottom of page five of the Proposal with nothing but an inch of blank space below the labeled heading.  The court

agreed with Trico that the Proposal, by making only "mere mention" of the phrase "General Terms and Conditions of Sale," did not plainly refer to any separate document despite the fact that the external document had the same title. *Trico Marine Servs., Inc.*, 73 S.W.3d at 549.  The court explained that before a heading could incorporate something by reference, "it must first make a reference.  And that reference must be 'plain.'" *Trico Marine Servs., Inc.*, 73 S.W.3d at 550.  A heading with a blank space following it did not make such a reference.

Although LSI's Employment Agreement did not reference specific policies by name, it unambiguously makes plain reference to separate policies with respect to timekeeping.  The reference to LSI policies is not contained in a heading, but mentioned three separate times within the Agreement.  It is clear from the language used that separate policies exist apart from the Employment Agreement.  Section 21 of the Employment Agreement made all employment policies applicable to the terms of employment.  Then, in a separate writing, each employee signed an acknowledgment that they would "read and follow LSI's Timekeeping Procedures." This additional writing makes plain reference to specific timekeeping procedures.  The timekeeping procedures were therefore part of the Employment Agreement, and the employees were bound by them both by signing the Agreement and by separately signing the acknowledgment.

The explanation given in the Training Manual and in the written procedures concerning LSI's time keeping policies can only be given one reasonable interpretation and is not ambiguous.  The timekeeping policy, reviewed with employees during orientation, stated that employee time began when the employee arrived at his or her work station and ended upon departure.  The Training Manual, which each employee received upon arriving at their work

location, unambiguously explained that "[y]our time begins when you arrive at work and ends

when you depart."  The written Timekeeping Procedures further explained that employee time

began when the employee arrived at his or her "work location" and ended upon departure.  A

work location, as well as the activity of arrival and departure, connotes travel to a place different

from a person's living quarters, and therefore time spent commuting can not be included as

compensable time under the stated explanations.

        If the Court accepts Plaintiffs' argument that compensable work includes commuting, the

explanatory phrase describing when work commenced and ended would be expanded beyond its

ordinary and customary understanding.  To include commute time as a passenger, the

employee's "work location" would have to include an employee's living quarters.  Plaintiffs'

interpretation would eliminate the concept of arrival and departure, because there can be no

arrival or departure from an employee's living quarters if commute time from those locations

constitutes "work."  Under Plaintiffs' interpretation, "work" could conceivably include all time

spent by an employee once housed on base.  Such an interpretation under LSI's explanation of

"work" is patently unreasonable, and therefore no ambiguity exists as to what constitutes "work"

under the terms of LSI's Employment Agreement.  Under LSI's contract, if work began upon

arrival at a specific work site, any time spent commuting as a passenger was not compensable

work.

        This is not the case with drivers of the vans and busses, however.  The Employment

Agreement stated that employees would be "furnished transportation and housing at the

Assignment Location."  Def.'s Stmt. of Facts, Ex. B, ¶ 7, Docket No. 47-4.  LSI therefore

derived an economic benefit from having its employees "volunteer" as drivers for their fellow

employees, because LSI did not have to hire drivers to provide the transportation promised in the Agreement.  Also, the drivers were not free to spend their time as they wished during their commute, but were responsible for transporting employees at their employer's request.  Work for them began when they reported for duty as a driver.  LSI apparently conceded this point at the hearing, agreeing with the Court that an appropriate subclass of claimants would include drivers. Moreover, the facts are undisputed that after March 2006, LSI began compensating its personnel for driving vans and busses with the use of "flex time" during the employee's regular shift.  If LSI regarded driving as compensable, then it stands to reason that driving constituted "work" under its own interpretation of its contract, and there is no disputed issue of fact concerning the subclass of drivers.  Therefore, claims for overtime pay for *commuting* are limited to those employees driving LSI vans and busses employed between March 1, 2004 and March 2006.

**E.      The Plain Meaning of the Word "Work."**

Plaintiffs also advance an argument that the "plain meaning" of the word "work" includes commuting.  The Court disagrees.  Even if LSI's timekeeping policies were not incorporated by reference, the plain meaning of the word "work" suggests that time spent commuting does not constitute compensable "work."  When a word is not defined in a contract, the court interprets it according to its plain and ordinary meaning.  *Gray & Co. Realtors, Inc. v. Atlantic Housing Foundation, Inc.*, 228 S.W.3d 431, 434 (Tex. App. 2007) (defining the word "consummated" in a real estate purchase agreement according to its dictionary definition).  The word "work" is commonly defined as:

> "To exert one's self for a purpose; to put forth effort for the attainment of an object; to be engaged in the performance of a task, duty, or the like . . . . for purposes of determining employee's right

> to compensation [work] means physical and mental exertion
> controlled or required by employer and pursued necessarily and
> primarily for benefit of employer and business."

BLACK'S LAW DICTIONARY 1605 (6th ed. 1990).

Commuting is generally done by most employees to arrive at an employer's place of business from one's home.  In a sense, commuting is done for the benefit of an employer, otherwise the employee would not actually arrive at work.  But, the mere act of commuting confers no actual or practical benefit to the employer.  Commuting is unrelated to any task or operation of the employer, and only serves the employee in the sense that he or she actually arrives at his or her place of business to do the tasks for which the employee was hired.  The concept of "work" relates specifically to the tasks done at the direction of the employer and for the employer's economic benefit such that time spent commuting as a passenger under the facts of this case is not ordinarily understood as "work."  On the other hand, as previously discussed, the drivers of the vans and busses were doing a task at the direction of their employer and for the employer's economic benefit.  The plain meaning of "work" would, therefore, encompass driving vans and busses at the employer's request, especially considering that LSI compensated drivers by the use of flex-time after March 2006.

**F.      Applicability of the Portal-to-Portal Act.**

In addressing the Court's request, Plaintiffs argued that the PPA applied to the facts of this case, because Texas law necessarily incorporated Federal law.  However, the Plaintiffs failed to address the statutory framework of the FLSA, which LSI argued precluded any extraterritorial effect of the FLSA, and therefore by implication the PPA  The Court agrees with LSI that the

MEMORANDUM DECISION AND ORDER - 14

statutory exclusion in the FLSA preventing extraterritorial application also precludes application of the PPA

First, Plaintiffs' reliance upon *Yung v. Integrated Transp. Network Group, Inc.*, 2001 U.S. Dist. LEXIS 24715 (S.D.N.Y. Sept. 4, 2001) in support of their argument that the PPA applies is misplaced.  While it is true that case stated that agreements providing for the application of New York state law necessarily included application of federal law, that case involved a securities transaction, not an employment case decided under the FLSA.  The issue presented in *Yung* was whether federal securities laws applied to a foreign securities transaction when Chinese citizens purchased securities offered by a Delaware corporation with stock registered with the United States Securities and Exchange Commission.  The court in that case did not reach that issue, however, because it ultimately decided that two of the defendants' motions to dismiss for lack of subject matter jurisdiction and *forum non conviens* be granted. *Yung*, 2001 U.S. Dist. LEXIS at *73.

Moreover, even if Texas law necessarily incorporates Federal law as part of the Employment Agreement, the FLSA expressly states that foreign employment is not covered by the FLSA.  Specifically, sections 206, 207, 211, and 212 of the FLSA "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country. . . ."  29 U.S.C. § 213(f).  Section 206 of the FLSA requires payment of minimum wages to all employees engaged in commerce.  29 U.S.C. § 206(a).  Section 207 of the FLSA contains provisions relating to a standard workweek and overtime pay.  29 U.S.C. § 207.  Section 254, the PPA provision, expressly modifies the minimum wage provisions of the FLSA, stating that "no employer shall be subject to any liability or punishment under the Fair Labor

Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation," for time spent walking, riding or traveling.  29 U.S.C. § 254(a).  Before the PPA applies, the minimum wage and overtime compensation provisions of the FLSA must first be applicable.  29 U.S.C. § 254(d).[3]  Because the FLSA expressly exempts foreign employment from its application, including the minimum wage and overtime provisions, then it follows that the PPA does not apply because it is invoked as a  modification to the minimum wage and overtime provisions of the FLSA.  *See Smith v. Raytheon Co.*, 297 F.Supp.2d 399, 402 (D. Mass. 2004) (holding that the FLSA's overtime rate requirement did not apply to work performed in a foreign country).

>    **G.      Even Under the PPA, "Work" Does Not Include Commute Time in this Case.**

Even were the Court to conclude that the PPA applied, the results of cases decided under the FLSA and the PPA are contrary to Plaintiffs' contention that commute time is compensable. The Portal-to-Portal Act, 29 U.S.C. § 254, states:

>    (a) Activities not compensable

>    Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor

---

[3]  That section states:

>    *In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act* of 1938, . . . in determining the time for which an employer employs an employee with respect to walking, riding, traveling, or other preliminary or postliminary activities described in subsection (a) of this section, there shall be counted all that time, but only that time, during which the employee engages in any such activity which is compensable within the meaning of subsections (b) and (c) of this section.

29 U.S.C. § 254(d) (emphasis added)

Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947–

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. § 254(a).  To determine if an activity is a compensable principal activity rather than a noncompensable preliminary or postliminary task under section 254(a)(2) of the Act, courts ask whether an activity is "an integral and indispensable part of the principal activities for which covered workmen are employed."  *Baker v. Barnard Constr. Co., Inc.*, 146 F.3d 1214, 1216 (10th Cir. 1998) (citing *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).[4]

Cases that have discussed the issue of commute time generally hold that mere commuting, even if done in a company car or on a military base, is not compensable "work"

---

[4]  Plaintiffs cited *Baker* for support of their argument that commute time was compensable.  However, although the issue of commuting in that case was discussed, the court ultimately remanded the case and left for the jury to decide the issue of whether travel to and from the oil rigs was compensable as an "integral and indispensable part" of the plaintiffs' activities.  *Baker*, 146 F.3d at 1218.  Because the court did not decide the issue of commute time in that case, *Baker's* holding is not instructive.

under the FLSA.  For example, in *Mossbauer v. United States*, 541 F.2d 823 (9th Cir. 1976), an

enlisted man claimed entitlement to compensation for travel from the barracks furnished by the

Navy where he was required to live during the work week to his actual duty station, which was

fourteen miles away.  He traveled in a government vehicle provided for him.  He claimed that the

travel was carried out under "arduous conditions."  The court denied his request for

compensation, holding that the officer's daily journeys from his living quarters to his worksite

did not demonstrate a benefit to nor the performance of functions for his employer, and were no

different than any other suburban dweller's commute to his or her place of employment.

*Mossbauer*, 541 F.2d at 826.  This was true even though the officer was required to live at the

barracks during his work week, drove a government vehicle and drove over government land,

because he did nothing during the commute that was integral to the performance of his duties or

that conferred a benefit on his employer.  *Id.* at 826.

   In *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006), the court had

before it a company that encouraged car pooling arrangements.  In that case, rig hands working

for a servicing company on oil and gas wells claimed entitlement to pay for travel time to and

from the well sites.  While the employer did not require car pooling, there was strong company

pressure to do so because the employer would pay the cost of gas for only one vehicle per shift

and there was limited parking at the drill site.  Crew members were free to spend their time how

they wished during the commute.  The court held that under the PPA, employers are not required

to compensate their employees for time spent traveling to and from the place of their principal

activities, and that there was nothing in the statute indicating an exception simply because they

traveled with co-workers.  *Smith*, 462 F.3d at 1288.  Therefore, the employees failed to establish that the travel time in and of itself was work for which they must be compensated.  *Id.* at 1290.

As for the drivers of the vehicles, the court articulated that unless the employee's time was spent predominantly for the employer's benefit, and the employer required work during the major part of the commuting time, then that time should not be compensated.  *Id.* at 1291. Where the drivers were merely transporting others and had to arrive at work in any event, even though they discussed work with their subordinates, their task was no different than what a commuter would normally do on a drive to work with or without other passengers.  *Id.  See also Adams v. United States*, 471 F.3d 1321, 1328 (Fed. Cir. 2007) (holding that police officers required to commute from home to work in their patrol vehicles were not entitled to commute time compensation if no labor beyond the mere act of driving or other *de minimus* activity was involved).

Plaintiffs attempt to distinguish the facts of this case on the grounds that LSI employees were subjected to delay at military checkpoints.  However, the court in *Bonilla v. Baker Concrete Construction Co., Inc.*, 487 F.3d 1340, 1344–45 (11th Cir. 2007) decided a similar case involving employees traveling on employer-provided busses to a work site that had to also travel through security screening checkpoints.  Not only was the commute time not compensable, but the court also held that the time spent going through mandatory security screening was not compensable because it was not "integral and indispensable" to a principle work activity. *Bonilla*, 487 F.3d at 1345.

Under the facts of this case, there are two groups of commuters–those employees asked to volunteer as drivers and those that simply rode the bus as passengers.  LSI employees were

required to live on the military base in employer supplied housing, drive or ride on company supplied busses and vans, travel over hazardous territory, travel through security checkpoints, and travel significant distances in some cases.  In reviewing the case law decided under the PPA, it is clear that the passengers of the vans and busses were not engaged in any activity conferring a benefit upon LSI because mere riding of a company van on a military base from assigned housing through hazardous terrain, a security checkpoint, and over long distances is not "integral and indispensable" to the employees' principal work activities.  Thus, even if analyzed under the PPA, those employees merely riding company vans and busses would not be entitled to compensation for their commute time.

As for those employees asked to volunteer to drive company busses and vans, the Court has already concluded under the facts of this case that driving constituted "work" under the terms of the Employment Agreement, and it will not analyze this subgroup separately by analogy to the PPA.

MEMORANDUM DECISION AND ORDER - 20

## ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1.      Defendant LSI's Motion for Partial Summary Judgment (Docket No. 47) is

        **GRANTED IN PART AND DENIED IN PART.**

2.      Plaintiffs' Motion to Strike (Docket No. 63) is **GRANTED**.



DATED: June 9, 2008

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge